UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

MARY R. EBMEIER,                           :
                                           :
        Plaintiff,                         :
                                           :
v.                                         :        CASE NO.: 2:13CV327
                                           :
CAROLYN W. COLVIN,                         :
Acting Commissioner of Social Security,    :
                                           :
        Defendant.                         :

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Mary R. Ebmeier ("Ebmeier") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability insurance under Title II of the Social Security Act. 42 U.S.C. §§ 401-434. Specifically, Ebmeier claims the ALJ improperly evaluated the opinions of her treating physicians and erred in assessing the limitations imposed by her diagnosis of fibromyalgia. She also contends that post-hearing evidence submitted to the Appeals Council necessitates remand. (ECF No. 11 at 2-3). This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this report recommends that the final decision of the Commissioner be affirmed.

I.      PROCEDURAL BACKGROUND

On August 2, 2010, Ebmeier filed an application for disability benefits, alleging disability

1

beginning September 29, 2006[1], due to fibromyalgia, chronic fatigue syndrome, sleep impairment, attention deficit hyperactivity disorder and mood/anxiety disorder. (R. 16). The Commissioner denied her application initially on September 10, 2010 (R. 55), and upon reconsideration on February 18, 2011. (R. 62). Ebmeier requested an administrative hearing, which was conducted on January 9, 2012. (R. 27-47).

On February 8, 2012, an Administrative Law Judge ("ALJ") concluded that Ebmeier was not disabled within the meaning of the Social Security Act, and denied her claim for disability benefits. (R. 11-23). The Appeals Council denied review of the ALJ's decision on April 23, 2013 (R. 2-4), thereby making the ALJ's decision the final decision of the Commissioner. Pursuant to 42 U.S.C. § 405(g), on June 7, 2013, Ebmeier filed this action seeking judicial review of the Commissioner's final decision. This case is now before the Court to resolve the parties' cross-motions for summary judgment.

## II.   FACTUAL BACKGROUND

At the time of her date last insured in 2007, Ebmeier was 42 years old, a younger individual under Agency rules. 20 C.F.R. § 404.1563. She had a high school education, training in cosmetology, and past experience as a hair stylist, insurance biller, and entertainer.

Although Ebmeier filed her claim in August 2010, she alleged disability beginning September 2006, and her date last insured was September 30, 2007. Thus, to receive DIB Ebmeier had to establish disability at sometime between these two dates. The medical evidence reviewed by the ALJ spans years on both sides of her claimed period of disability.

Medical evidence in the record begins with Ebmeier's treatment by Dr. Samuel M. Shor in 2001. Dr. Shor diagnosed Ebmeier's fibromyalgia by use of trigger points, and followed her

---

[1] Ebmeier previously filed for disability in 2004, the date she last worked. Her first application was denied initially and on reconsideration. The decision became final on September 29, 2006 after Ebmeier failed to appear for her hearing. Her current application alleges disability beginning on that date. (R. 14).

until 2005. (R. 168-89, 318-19). On January 17, 2003, Dr. Shor saw Ebmeier during a follow-up for her chronic fatigue, fibromyalgia, sleep disorder and depression. (R. 178). She reported missing work due to pain and disruptions in her sleep. On physical exam that day, Dr. Shor noted tenderness at 12 of 18 trigger points for fibromyalgia. He increased a prescribed dose of Flexeril, prescribed Vicodin for breakthrough pain, and ordered a follow-up in two to three weeks. (R. 178-80).

Ebmeier returned in less than a week complaining of a rash and no effect from the Flexeril. Her medications were adjusted and she was directed to return for a previously scheduled February visit. (R. 177). There is, however, no record of another follow-up until June 24, 2003, when Ebmeier consulted a physician's assistant at the practice for a sinus infection. (R. 173).

On January 8, 2004, Ebmeier again returned for "routine follow-up." She reported that the Adderall had helped her chronic fatigue, without making her jittery. She had stopped B-12 injections, stating she had not needed them. Her fibromyalgia was described as "generally okay 'it is there but I don't think about it all the time.'" (R. 171). Dr. Shor described her condition as "better" and continued her existing treatment. Her last documented visit with Dr. Shor was September 4, 2004 during which she described pain in her lower and mid back. Dr. Shor's exam found tenderness at 18 of 18 trigger points for fibromyalgia. He noted that it had worsened and prescribed Flexeril with direction to consider another medication modification. (R. 168-69). In a check-the-box questionnaire completed almost a year later on August 19, 2005, Dr. Shor stated that Ebmeier displayed the signs of fibromyalgia and that the effect of her pain and side effects of her medication would preclude even unskilled work-related tasks performed at the sedentary level. (R. 318-19).

The medical record between 2006 and 2007 primarily documents Ebmeier's treatment with her primary care physician, Dr. Steven Pearman. Ebmeier testified that she treated with Dr. Pearman for "everything," and the records primarily relevant to her work-limiting conditions involved treatment for fibromyalgia, anxiety, ADHD and chronic fatigue. (R. 34). She also consulted with Dr. Pearman for a variety of transient conditions, including poison ivy (R. 244, 264), chest colds (R. 256), a sore throat (R. 252), and sinus congestion (R. 246).

During the relevant time period between 2006 and 2007 there are few medical records documenting the status of her alleged work-limiting impairments. The first, on December 8, 2006, records that Ebmeier complained of difficulty sleeping and increased anxiety and stress due to her son's autism. (R. 254). She also described feelings of fatigue related to her medications. Dr. Pearman reviewed her current prescriptions and directed a follow-up in three months. During that follow-up visit on March 30, 2007, the same condition was noted as "stable." Ebmeier again reported stress over her son's illness and the cost of care, and her feeling that her husband had ADHD as a result of an on-line test. (R. 249).

In total, only three visits with Dr. Pearman during the relevant time period between 2006-07 involved consultation for her allegedly debilitating conditions. Several of her consultations involved medication management. Throughout this time period, and through the date of the hearing, Ebmeier was prescribed Adderall, Vistaril, and Clonazepam. (R. 254, 244, 238). Although Ebmeier maintained the same diagnoses of fibromyalgia and ADHD, she was not referred for specialized treatment nor did her treating physician make significant changes to her medication during the relevant time period.

After her date last insured, at a visit to Dr. Pearman on September 4, 2008, he noted that Ebmeier was continued on Adderall once daily because, as she reported, she "would [otherwise]

sleep all day." Dr. Pearman also noted that Ebmeier was "still up at night working as a private investigator . . . [and] with bounty hunter." He described her continuing back problems related to her breast implants and noted that she was working to lose weight and trying to get insurance approval for a breast reduction. He described her continued shoulder and neck pain but reviewed and continued all of her previous medications. In her physical exam that date she was oriented, developed, nourished and not distressed, negative for headaches, negative for dizziness, with a normal gait. She complained of excessive sleepiness in the afternoons and reported memory loss and depression, but denied being nervous or anxious. (R. 221-22).

Ebmeier returned to Dr. Pearman again on December 23, 2008 with a chief complaint of sore throat, upper respiratory infection and flu-like symptoms. On that date she complained of headaches, congestion and aching in her chest. A physical exam revealed a normal range of motion and no distress. She was prescribed Amoxicillin and diagnosed with a sinus infection. (R. 217-18).

On January 6, 2009, Ebmeier returned to Dr. Pearman with complaints of fibromyalgia, anxiety, chest, shoulder and back pain due to her breast condition. At the time, Dr. Pearman noted that a breast reduction surgery was scheduled for January 10, and prepared a letter of medical necessity. In the January 6, 2009 letter addressed "To Whom It May Concern," Dr. Pearman described Ebmeier's medical treatment since June 2005. He described her diagnosis of fibromyalgia and stated that she suffered with ongoing neck, shoulder, and chest pain exacerbated by the weight of her breasts and the shifting of implants. He concluded that a breast reduction for Ebmeier would be medically necessary.[2]

With regard to her other conditions, he noted that she was "positive for myalgias, neck

---

[2] Although records of the surgery are not in the Administrative Record, later consultations record that Ebmeier did have the recommended breast reduction procedure. (R. 299).

pain, back pain and joint pain, but negative for dizziness. He described her as oriented with a normal range of motion and continued her on medications. (R. 215-16). At a May 6, 2009 follow-up, Dr. Pearman reported chief complaints of hyperlipidemia, itching and anxiety. He reported her symptoms as negative for weight loss and malaise and fatigue, negative for myalgias and joint pain, negative for dizziness and negative for depression and memory loss. She was alert and oriented with a normal mood and affect and in no distress. (R. 211-12).

On June 16, 2010, Dr. Pearman again saw Ebmeier for follow-up on her continuing conditions. He diagnosed ADD, chronic fatigue, fibromyalgia and anxiety. He reviewed her medications and maintained "current meds as medical problems remain stable." (R. 195). In one of Dr. Pearman's last encounters documented in the medical record, Ebmeier complained of contact dermatitis related to poison ivy exposure. According to Dr. Pearman's notes, "on 8/24/2010 patient was cutting down trees and developed poison ivy." Again his physical exam noted she was well-developed, well-nourished and in no distress. He prescribed medication for her rash and itching and directed follow up if her symptoms worsened or persisted. (R. 190-91).

Ebmeier's first treatment for migraine headaches came in December 2010 when she was referred to neurologist Dr. Arnelito Malapira. Dr. Malapira noted that although she had a history of fibromyalgia and chronic fatigue, her first migraine headache was in August of 2009. (R. 298). On exam by Dr. Malapira, Ebmeier reported fatigue, headaches, stiffness and joint pain, but her motor strength was good in upper and lower extremities. She had normal tone and bulk, symmetric reflexes and normal coordination and gait. (R. 302).

Although Dr. Pearman's medical reports in the record conclude in 2010, on January 6, 2012 he wrote another letter addressed "To Whom It May Concern," which Ebmeier also submitted. In his 2012 letter Dr. Pearman described Ebmeier's "active and ongoing medical

6

problems," including fibromyalgia with associated chronic muscle and joint pain, Attention Deficit Disorder, anxiety, depression, and chronic fatigue. He described her current symptoms to include attention deficits, widespread joint and muscle pain, muscle spasms, burning in her extremities, disrupted sleep cycle, and severe fatigue, and concluded that the combination of these symptoms and the side effects of medication "limit her ability to perform many, if not all forms of work." (R. 320).

Likewise, Dr. Shor prepared a letter dated June 12, 2012 for submission with Ebmeier's claim. Shor's medical records of treating Ebmeier concluded in 2005, more than two years before her date last insured. Nonetheless, in 2012, seven years after his last treatment, Dr. Shor stated that Ebmeier "remains 100% disabled due to 'profound fatigue' with limited 'windows' of functional reserved [sic] exacerbated by cognitive impairment and pain." Although Dr. Shor had not treated Ebmeier in some time, he observed that at her June 21, 2004 "annual review, her fatigue score was 53/63 consistent with a persisting significant degree of functional impairment AT THAT TIME." (emphasis in original) (R. 325).

In connection with her application for benefits, Ebmeier's records were also reviewed by State Agency Psychologist David Deaver, PhD. Dr. Deaver noted no restrictions in Ebmeier's activities of daily living and no episodes of decompensation. He found only mild difficulties in social functioning, concentration, persistence and pace. (R. 58-59). On reconsideration, State Agency doctor Hillary Lake, M.D. reached similar conclusions. (R. 66-67). With regard to Ebmeier's physical limitations, two agency physicians also reviewed the records and concluded they failed to demonstrate any severe physical impairment between Ebmeier's onset date of September 29, 2006 and date last insured of September 30, 2007. (R. 58, 66).

In addition to the medical evidence, Ebmeier and her husband both testified concerning her conditions and their effect on her abilities. Ebmeier testified that she was unable to perform routine housework and relied on her husband to do most of the family chores. She described being able to prepare simple meals such as oatmeal and put laundry in the wash, but she relied on her husband to dry and fold the laundry. She did state she could wash dishes and do light shopping, but was unable to vacuum. She stated that she did not socialize or go on vacations, nor did she get any exercise other than "walking around her house." (R. 37-38). She described spending most of her day in the house watching television. (R. 39).

Ebmeier is the primary caregiver for her autistic son, getting him to school and spending time with him each day after school. She was able to do some household chores with help from family but was frequently bothered by pain and had difficulty sleeping. (R. 130, 149-50). She is able to drive and independently handle her personal hygiene. (R. 36, 38-39).

In addition to her testimony, Ebmeier offered the testimony of her husband, Greg Ebmeier. Mr. Ebmeier testified that he had been living with his wife since before her DLI. He confirmed that she did little housework and that he performed the cooking, cleaning and trash removal. He stated that she frequently dropped objects, complained about her pain daily and sometimes fell down. (R. 43-45).

Finally, the ALJ also considered the testimony of a Vocational Expert ("VE"). The VE first testified that Ebmeier's past work as a hairstylist was skilled light work, and as an insurance biller, semi-skilled sedentary. Her work as an entertainer was described as skilled, heavy work. (R. 45). In response to a hypothetical framed by the ALJ, the VE testified that a person of Ebmeier's age, education and work background, who was capable of light work with no more than occasional postural activities and simple routine one or two-step instructions could perform

8

jobs such as mail sorter and ticket taker which exist in substantial numbers in the national economy. (R. 46). The ALJ then asked if Ebmeier's testimony concerning her need to constantly lie down or rest due to pain were accepted, whether any work would be available and the VE responded "no". (R. 46). The VE also testified that her descriptions of employment were consistent with the Dictionary of Occupational Titles. (R. 46).

### III.   STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Pearman v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial

evidence on the record, or the ALJ made an error of law.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.    ANALYSIS

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act.

The Social Security Regulations define "disability" as the:

> Inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A).  To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.  20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability.  The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

## A.   The ALJ's Decision

In this case, after first finding that Ebmeier last met the insured status requirements of the Social Security Act through September 30, 2007, the ALJ made the following findings under the five part analysis: (1) Ebmeier did not engage in substantial gainful activity during the period from her alleged onset date of September 29, 2006 through her last insured date of September 30, 2007; (2) Ebmeier had severe impairments of fibromyalgia, chronic fatigue syndrome, sleep impairment, attention deficit hyperactivity disorder ("ADHD"), and mood/anxiety disorder; (3) her combination of impairments did not meet one of the listed impairments in Appendix 1; and

11

(4) Ebmeier had the RFC to perform light work with specified limitations to avoid more than occasional climbing, crawling, balancing, crouching, and kneeling and avoid jobs that require more than routine, repetitive one or two-step tasks. (R. 19-22). Finally, although the ALJ concluded that Ebmeier could not perform her past relevant work, he did identify jobs which exist in significant numbers in the national economy which Ebmeier could perform. (R. 22-23).

Ebmeier now argues that the ALJ erred in finding her not disabled. Specifically, she claims that the Commissioner: (1) failed to accord appropriate weight to the opinions of her treating physicians, (2) improperly evaluated post-hearing medical evidence and (3) failed to abide by SSR 12-2P regarding her diagnosis of fibromyalgia. The Court considers each argument below.

**B.** **The ALJ properly evaluated the evidence bearing on Ebmeier's RFC.**

Ebmeier contends that the ALJ erred in determining her RFC, which is defined as the plaintiff's maximum ability to work despite her impairments. 20 C.F.R. § 404.1545(a)(1); see SSR 96-9p, 1996 WL 374185 (S.S.A.) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis."). When a plaintiff's impairments do not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must then determine the plaintiff's RFC. 20 C.F.R. § 404.1520(e). After doing so, the ALJ uses that RFC at step four of the sequential analysis to determine whether the plaintiff can perform his past relevant work. Id. at § 404.1545(a)(5)(i). If it is determined that the plaintiff cannot perform past relevant work, the ALJ uses the RFC at step five to determine if the plaintiff can make an adjustment to any other work that exists in the national economy. Id. at 404.1545(a)(5)(ii).

At the administrative hearing level, the ALJ alone has the responsibility of determining

12

RFC. Id. at § 1546(c). RFC is determined by considering all the relevant medical and other evidence[3] in the record. Id. at §§ 404.1545(a)(3) and 404.1527(b). Relevant evidence includes "information about the individual's symptoms and any 'medical source statements' – i.e., opinions about what the individual can still do despite his or her impairment(s) – submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A.). In this case, the ALJ found that Ebmeier has the RFC to perform light work with specified limitations. (R. 19).

Ebmeier first contends that the ALJ erred by improperly considering and evaluating the evidence submitted by her treating physicians, Dr. Shor and Dr. Pearman. (ECF No. 11 at 13-15). Although she has not identified any specific medical record which contradicts the ALJ's findings, she argues generally that the ALJ summarily dismissed their opinions, and failed to assess them in accordance with the SSA Rules. Ebmeier further contends that the proper assessment of both opinions would have led the ALJ to credit their opinions suggesting she was incapable of fulltime work.

As stated previously, the ALJ alone has the responsibility of determining RFC. In doing so, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. In assigning weight to any medical opinion, the ALJ must consider the following factors: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527.

---

[3] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical source. Id. at § 404.1527(d)(1)-(2). A treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. at § 404.1527(d)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590.

Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations]." SSR 96-2P, 1996 WL 374188, at *5 (S.S.A.). When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for his decision. Id. at § 404.1527(d)(2).[4]

Here, the ALJ found, after "careful consideration of the entire record," that Plaintiff is capable of performing light work with additional detailed limitations to account for her "activity induced symptoms." (R. 19). Specifically, the RFC restricted her to jobs that required no more than routine, repetitive one or two step tasks and limited unusual postural changes, such as crawling, climbing, balancing, crouching or kneeling. (R. 19). In making the RFC determination, the ALJ provided a lengthy review of Plaintiff's treatment record including the records and opinions of both treating physicians Dr. Shor and Dr. Pearman, even though Dr. Shor's treatment had been fully concluded by 2005, a year before her onset date.

The ALJ did credit Ebmeier's statements that her condition caused her to have difficulty

---

[4] In fact, under the applicable regulations, the ALJ is required to "explain" in his decision the weight accorded to all opinions – treating sources, nontreating sources, state agency consultants, and other nonexamining sources. 20 C.F.R. § 404.1527(f)(2)(ii).

14

with bending and complex tasks and he accommodated those limitations in the RFC. In reviewing the opinion evidence the ALJ gave little weight to either Dr. Shor or Dr. Pearman's statements on disability because they "failed to identify function by function limitations or a rationale for the restrictions." (R. 21). The opinion further observed that the actual treatment records in evidence provided no basis for the limitations described. Contrary to Ebmeier's claim, this is an adequate explanation for the ALJ's decision. Neither doctor's opinion on the ultimate issue of disability is entitled to deference, and the medical records submitted by each fully support the ALJ's conclusion to assign the opinion letters little weight.

Specifically, Dr. Pearman's records, both during the alleged period of disability and for years after, demonstrate an essentially stable regimen of medical management for her symptoms. His physical exams throughout reveal essentially normal findings with the exception of Ebmeier's self-reports of pain. Although Dr. Pearman maintained Dr. Shor's diagnosis of fibromyalgia, he did not record his own trigger-point assessments, and the physical examination he did perform did not document objective limits in her strength or range of motion. As noted by the ALJ, her physical appearance during nearly every visit was recorded as "comfortable." (R. 19, 269, 267, 266, 263). Among the other options for her appearance which were not checked: "uncomfortable, ill, anxious or dysphoric." (R. 266).

With regard to the Agency consultants, the ALJ noted that both concluded that Ebmeier had failed to demonstrate any severe medically determinable impairment, but he resolved all doubt in Ebmeier's favor for the period of disability by expressly crediting Dr. Shor's diagnosis and concluding that her fibromyalgia and chronic fatigue were severe impairments. (R. 21). Finally, the ALJ noted that Ebmeier's own testimony and the longitudinal record of her treatment established that her conditions progressively worsened after her DLI. He observed that she was

diagnosed with migraine headaches well after 2007 and regularly took narcotic pain medication only after 2008. But despite the increased intensity of her symptoms, she still did not seek specialized care or additional therapies beyond medication management. As a result, the ALJ concluded evidence that her symptoms were not disabling as of 2007 was especially compelling.

A claimant's RFC is determined by considering all the relevant medical and other evidence in the record and the weight assigned to an opinion is in part determined by how consistent it is with the medical record. The ALJ determined that the RFC was supported by Ebmeier's record of very conservative treatment that continued for years after her DLI despite evidence that her symptoms progressively worsened. He also relied on her ability to engage in daily activities and social interaction. He noted that her care consisted almost exclusively of medication management. She had not been referred for specialized treatment, and had undergone no physical therapy or counselling to address her allegedly debilitating condition. As a result, he properly analyzed the medical evidence.

In a separate challenge, Ebmeier also asserts that Dr. Pearman's 2012 opinion – rendered almost five years after her DLI – should be "linked" back to her pre-DLI complaints. Focusing on one sentence in the ALJ's opinion, she argues that he erroneously dismissed the opinion on the basis that it was dated after her DLI. See Bird v. Commissioner of Social Security, 699 F.3d 337 (4th Cir. 2012). "Medical evaluations made after a claimant's status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." Bird, 699 F.3d at 340 (citing Wooldridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987)). Evidence created after a claimant's DLI that permits an "inference of linkage" between a claimant's post- and pre-DLI condition "could be the 'most cogent proof' of a claimant's pre-DLI disability." Id. (quoting Moore v. Finch, 418 F.2d 1224, 1226 (4th Cir.

1969)). Accordingly, "retrospective consideration of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." Id. (quoting Moore, 418 F.2d at 1226). If there is no evidence linking additional impairments to the claimant's condition prior to her DLI, however, the ALJ is not required to retrospectively consider that information. Id. See also Pearman v. Barnhart, 434 F.3d 650 (4th Cir. 2005).

Bird involved a veteran who was diagnosed with post-traumatic stress disorder ("PTSD") after his DLI, stemming from his service in the Vietnam War. Id. at 339. In denying Bird's claim, the ALJ had relied on the lack of medical evidence from the period prior to his DLI (March 31, 2005), as well as the fact that a Veterans Administration decision finding him 100% disabled became effective in June 2006, 15 months after his DLI. Id. at 340. The ALJ also assigned little weight to a psychological report from July 2007 as it "failed to reflect Bird's pre-DLI condition." Id. In reversing the District Court's decision affirming the ALJ, the Fourth Circuit observed that the "rating decision summarized evidence that Bird suffered from severe symptoms of PTSD before June 2006, and before his DLI. Most notably, the September 2007 psychological examination conducted by the VA indicated that Bird's symptoms of PTSD had been ongoing since his return from military service in Vietnam." Id. at 341. Since that evidence linked Bird's present condition to symptoms he had experienced prior to his DLI, the Court held that it was error not to consider it. Id. at 342.

Unlike the ALJ's opinion in Bird, the ALJ here carefully examined Dr. Pearman's 2012 statement and applied no categorical bar as a result of its timing. In fact, he considered all of the evidence presented, much of which fell outside Ebmeier' DLI – which passed some 5 years prior to the hearing date. He determined Dr. Pearman's statements should be afforded little weight,

but not solely because they were dated after her DLI. Although the ALJ's opinion includes the statement that Dr. Pearman's 2012 letter "has no bearing on the claimant's function five years ago," this conclusion was based on Dr. Pearman's own description in the letter of Ebmeier's "current symptoms." (R. 320). More importantly, the ALJ also rejected the opinion on the basis that it did not specify any function-by-function limitations that would support the restrictions, and that it was unsupported by Dr. Pearman's own medical records which had already been thoroughly and thoughtfully considered. In short, the ALJ carefully considered the entire record, and explained his decision to discount Dr. Pearman's 2012 opinion. After independently examining the medical record and the ALJ's report, the Court finds that the ALJ sufficiently explained the weight assigned to all of the evidence, including the medical records from Ebmeier's treating providers, and the opinions of the State agency consultants, and did not err in determining Ebmeier's RFC.

## C.   The Appeals Council was not required to explain its denial of review.

Ebmeier next assigns error to the Appeals Councils decision to deny review without explaining its assessment of post-hearing evidence. After her claim was denied at the hearing level, Ebmeier submitted a letter from the previous treating physician, Dr. Shor. The letter, dated June 12, 2012, concluded that Ebmeier was "100% disabled" based on her "profound fatigue" and other limiting symptoms. (R. 325). The Appeals Council considered the evidence, but denied review without explanation. (R. 2, 5).

When denying requests for review, the Appeals Council is not required to provide detailed analysis of its conclusion on post-hearing evidence. Meyer v. Astrue, 662 F.3d 700, 706 (4th Cir. 2011); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); Damato v. Sullivan, 945 F.2d 982, 988 (7th Cir. 1991). Only when the Council grants review and issues its own

decision on the merits do the regulations require it to explain the basis for its decision.  Meyer, 662 F.3d at 706 (citing 20 C.F.R. §§ 404.979, 404.1527(f)(3)).  Meyer may, however, require remand when the new evidence submitted is not explained and its effect on the record as a whole prevents the reviewing court from concluding that the ALJ's decision was supported by substantial evidence.

While the Appeals Council was not required to explain its refusal, "an express analysis of the Appeals Council's determination would [be] helpful for purposes of judicial review." Meyer, 662 F.3d at 706 (quoting Martinez v. Barnhart, 444 F.3d 1201, 1207-08 (10th Cir. 2006)).  But the absence of such analysis does not preclude judicial review when "the record provides 'an adequate explanation of [the Commissioner's]' decision."  Meyer, 662 F.3d at 707 (quoting DeLoatche v. Heckler, 715 F.2d 148, 150).

Here, the Appeals Council's failure to explain the basis for its denial does not require remand.  It is not clear what Dr. Shor's 2012 letter purports to document.  Although he recites that he based his 2012 opinion on an "evaluation this date," he submitted no contemporaneous record of a medical examination, and relied instead upon his treatment history, including a 2004 assessment, to support his conclusion.  (R. 325).  Indeed, it seems the only "new" information contained in the letter is Dr. Shor's finding that Ebmeier was "100% disabled."  Such findings are reserved to the Commissioner and not entitled to controlling weight.  More importantly, Dr. Shor's actual records, including a functional assessment he prepared on August 19, 2005, were reviewed in detail by the ALJ in reaching his decision on Ebmeier's RFC.  (R. 21, 318-19).  As set forth above, this analysis included detailed, legally sufficient reasons for the weight assigned. Nothing in Dr. Shor's letter undermines that analysis or suggests that the record as a whole would require remand.

**D.**     **The ALJ was not required to apply SSA Rule 12-2P which was adopted after Ebmeier's claim was denied.**

Lastly, Ebmeier contends that remand is required to permit the ALJ to assess her diagnosis of fibromyalgia under the recently promulgated SSA Rule 12-2P.  S.S.R. 12-2P, 2012 WL 3104869 (S.S.A. July 25, 2012).  Rule 12-2P sets forth guidance on how the Commissioner will determine whether a claimant has a medically determinable impairment ("MDI") of fibromyalgia, and how that condition will be evaluated in the disability process.  The Rule was adopted effective July 25, 2012 and thus, by its terms did not apply to Ebmeier's case which was decided February 8, 2012.  But because the Rule adopts medical diagnostic criteria which predate the ALJ's decision in her case, Ebmeier argues remand is appropriate to permit analysis of her condition under the later promulgated standard.

After reviewing the text of the Rule, and the ALJ's conclusions regarding Ebmeier's fibromyalgia, the undersigned finds no basis to require remand.  To begin with, the Rule did not apply when the ALJ analyzed Ebmeier's claim.  The diagnostic criteria relied upon in Ebmeier's brief, relate to the Rule's provisions concerning the general criteria necessary to establish that a person has a medically determinable impairment of fibromyalgia.  2012 WL 3104869 at *2.  In this case, the ALJ already determined that Ebmeier's fibromyalgia was an MDI, and that it was severe.  As a result, any ambiguity in the use of unspecified criteria was already resolved in her favor.

The remainder of Rule 12-2 merely sets forth the same sequential evaluation necessary to determine disability.  For example, the Rule notes that fibromyalgia alone can never meet a listing in Appendix 1 because it is not itself a listed impairment.  Id. at *6.  As a result, fibromyalgia must be evaluated to determine whether, singly or in combination with other

impairments, it meets the criteria of another listed impairment. If not, the ALJ's analysis moves to Step 4 where RFC is determined by considering the limitations imposed by all impairments, severe and non-severe.

Even without the benefit of Rule 12-2P's guidance this is precisely the analysis applied by the ALJ. He found Ebmeier's fibromyalgia to be a severe MDI but he concluded it did not meet or equal a listed impairment and in combination with all her other impairments the limitations imposed by her condition did not preclude all work. As a result, the SSA's later enactment of Rule 12-2P, formalizing the process already utilized by the ALJ, provides no basis to require remand.

## V.    **RECOMMENDATION**

For the foregoing reasons, the Court recommends that the Court DENY Ebmeier's Motion for Summary Judgment (ECF No. 10), GRANT the Commissioner's Motion for Summary Judgment (ECF No. 12) and AFFIRM the final decision of the Commissioner.

## VI.    **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.      A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

April 30, 2014

<u>Clerk's Mailing Certificate</u>

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

John Harlow Klein
Montagna Klein Camden LLP
425 Monticello Avenue
Norfolk, VA 23510

Daniel Patrick Shean
U.S. Attorney's Office (Norfolk)
101 W. Main Street, Suite 8000
Norfolk, VA 23510

Fernando Galindo, Clerk


By _____
        Deputy Clerk

_____, 2014

23